(593 P.2d 14)

No. 49,628

American Fidelity Insurance Company, a corporation; Vernon Bender and John David Schneider, *Appellees,* v. Employers Mutual Casualty Company, a corporation, and Carl Richard Olson, *Appellants.*

Opinion filed April 6, 1979.

*Christopher Randall,* of Turner and Boisseau, Chartered, of Great Bend, for the appellant, Employers Mutual Casualty Company.

*Jerry M. Ward,* of Ward and Berscheidt, of Great Bend, for the appellees.

Before FOTH, C.J., ABBOTT and MEYER, JJ.

FOTH, C.J.: This is a declaratory judgment action to determine the respective coverages and duties to defend of two insurance companies.

Plaintiffs Vernon Bender and John Schneider are football coaches employed by Unified School District 208 of Trego County. In 1976 the two coaches and the school district were sued by defendant Carl Olson, a student athlete, for personal injuries allegedly caused by the negligence of the coaches. The coaches were each covered by a teacher's professional liability policy issued by the plaintiff American Fidelity Insurance Company. The school district had in effect a liability policy issued by defendant Employers Mutual Casualty Company. This action was precipitated by Employers' denial of coverage to and refusal to defend the two coaches on the ground that they were not named insureds under its policy issued to the school district.

The case was submitted on the pleadings, exhibits and briefs. The trial court held (1) the coaches were insureds under Employers' policy, so that Employers owed them both coverage and a defense; (2) Employers' coverage was primary while American Fidelity's was excess; and (3) because the Olson claim of $152,380.33 was less than Employers' $300,000 policy limit the excess carrier had no duty to defend. Employers appeals.

Employers does not contest the second holding—that it is the primary carrier—if the coaches are covered; its policy's "other insurance" clause provides that it is primary insurance, while that of American Fidelity says it is excess. Employers' chief contention is that the coaches are not within its policy definition of an "insured":

"Each of the following is an insured under this insurance to the extent set forth below:

. . . .

"(c) if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such . . . ."

Employers asserts that, since the named insured is "Unified School District # 208," the coaches are not covered because they are not officers, directors or stockholders of the school district.

The trial court held that the Employers policy provided coverage for the school district's teachers and employees, even though by its terms the policy may have only covered the school board members. The court reasoned as follows:

1. The applicable statutes provide that insurance purchased by a school district must adequately insure teachers and employees for their negligent acts in the course of their employment.

2. When a policy is issued pursuant to statute, it must afford the coverage indicated in the statute, even if it does not do so expressly.

3. The Employers policy expressly provides that it will conform with any applicable statutes if it does not do so otherwise.

The second and third of these propositions are undisputed. The policy provision is standard, and even without it the law is unequivocal:

"The rule is well established in Kansas that where a policy of insurance is issued to an insured in compliance with the requirements of a statute, the pertinent provisions of the statute must be read into the policy, and no provisions of the policy in contravention of the statute can be given effect. (*Dunn v. Jones,* 143 Kan. 218, 53 P.2d 918, opinion denying rehearing 143 Kan. 771, 57 P.2d 16; *Millers Nat'l Ins. Co. v. Bunds,* 158 Kan. 662, 149 P.2d 350; *Cuddy v. Tyrrell,* 171 Kan. 232, 237, 232 P.2d 607; and *Sterling v. Hartenstein,* 185 Kan. 50, 341 P.2d 90, and cases accumulated at page 54.)" *Canal Insurance Co. v. Sinclair,* 208 Kan. 753, 758, 494 P.2d 1197 (1972).

The real question is whether liability insurance issued to a school district is required by statute to cover teachers and other employees. Two acts of the 1969 legislature are controlling. The first, chapter 358, became K.S.A. 72-8405 and 8406:

72-8405. "The board of education of any unified school district is authorized to purchase public liability and property damage insurance *for its members and for*

*its officers, agents and employees.* Such insurance may be purchased for the purpose of providing protection for said *members, officers, agents and employees* for any personal liability they might have as a result of any of their acts or omissions arising out of and in the scope of their services for the school district." (Emphasis added.)

72-8406. "The amounts of coverage provided in insurance policies purchased pursuant to section 1 [72-8405] of this act shall be in such amounts and for such specific risks as the board deems advisable. . . ."

## The second, chapter 360, became K.S.A. 72-8407 through 8409:

72-8407. "On and after January 1, 1970, the board of education of any school district is authorized and permitted to purchase public liability and property damage insurance *for the protection and benefit of said school district and the officers, agents, teachers and employees* from liability as a result of any of their acts or omissions arising out of and in the scope of their services for the school district which shall result in damage or injury: *Provided, however,* The public liability and property damage insurance policy so purchased shall provide coverage to a limit, exclusive of interest and costs of not less than one hundred thousand dollars ($100,000) because of death, bodily injury and/or damage or destruction of property in any one occurrence. The insurance purchased as provided in this act shall be limited to the kinds of insurance hereinbefore set out. . . ." (Emphasis added.)

72-8408. [Provides that a school district securing insurance waives governmental immunity to the extent of the insurance.]

72-8409. "The contract of insurance purchased pursuant to this act must be one issued by some insurance company or association authorized to transact such business in the state of Kansas and *must by its terms adequately insure such school district, its officers, agents, teachers and employees* under standard policies of insurance approved by the state insurance commissioner for the type of coverage provided for in section 1 [72-8407] of this act for any damages by reason of death or injury to person or property proximately caused by the negligent acts of any person acting for or on behalf of said school district within the scope of his authority or within the course of his employment. Any company or association which enters into a contract of insurance as above described with the school board of any school district of this state by such act waives any defense based upon the governmental immunity of the school district and its officers, agents, teachers and employees." (Emphasis added.)

## The two acts deal with the same subject and were enacted at the same session within a few days of each other. They are subject to well known rules of statutory construction.

"In construing a statute, legislative intent is to be determined by consideration of the entire act. The several provisions of an act, *in pari materia,* must be construed together with a view of reconciling and bringing them into workable harmony and giving effect to the entire statute if it is reasonably possible to do so." *Easom v. Farmers Insurance Co.,* 221 Kan. 415, Syl. ¶ 3, 560 P.2d 117 (1977).

". . . Statutes relating to the same subject, although enacted at different times, are *in pari materia* and should be construed together." *Claflin v. Walsh,* 212 Kan. 1, Syl. ¶ 6, 509 P.2d 1130 (1973).

Employers' statutory argument, while paying them lip service, flies in the face of these principles. Ignoring the second act, 8407-9, Employers argues that 8405 recognizes different classes of potential insureds, and that 8406 authorizes a district to select the risks to be insured against. Under this act, it argues, the district's board could and did insure only its own members against person liability, at public expense.

We cannot believe this was the legislative intent. In the first place, 8405 itself uses the conjunctive "and" in authorizing insurance "for its members *and* for its officers, agents and employees." (Emphasis added.) Thus, even read in isolation the section appears to require that insurance, if obtained, cover all individuals running or employed by the district. More important, however, is the meaning which emerges when both acts are read together.

Both became "effective" July 1, 1969, when they were published in the session laws. The second, however, speaks only to that time "[o]n and after January 1, 1970." After that time the insurance authorized by statute is to be "for the protection and benefit of said school district and the officers, agents, teachers and employees." K.S.A. 72-8407. The Employers policy was purchased in 1973, and was subject to this later act. That act also required that such insurance "must by its terms adequately insure such school district, its officers, agents, teachers and employees" under standard approved policies. K.S.A. 72-8409. If this act is applicable, it seems obvious that it requires coverage of the two coaches here.

Employers seems to say that the district had two choices, to insure under the earlier act with limited coverage, or under the later act with broader coverage. Again, this runs counter to our perception of legislative intent. If this open-ended construction of 72-8405 were intended, the whole insurance question would rest in the discretion of the board and the later sections would be surplusage. However, in the later sections the legislature not only specifically prescribed who should be covered but also prescribed minimum policy limits. Under Employers' construction this would be a futile legislative act—a result to be avoided if reasonably possible. *Consumers Co-operative Ass'n v. State Comm. of Rev. & Taxation,* 174 Kan. 461, 466, 256 P.2d 850

(1953); *Brown v. Illinois Bankers Life Assur. Co.,* 144 Kan. 670, 675, 63 P.2d 165 (1936).

In our view the two acts must be construed together. The earlier act, 8405-6, gave somewhat greater discretion to the district until January 1, 1970, where the later act became operative. After that date the more specific provisions of 8407-9 govern. Where in conflict, the later provisions must prevail, not only because the general must yield to the specific (*Continental Ins. Co. v. Windle,* 214 Kan. 468, 472, 520 P.2d 1235 [1974]; *State, ex rel., v. Throckmorton,* 169 Kan. 481, Syl. ¶ 2, 219 P.2d 413 [1950]), but because they apply to a later period in time. *State v. Ricks,* 173 Kan. 660, 661-2, 250 P.2d 773 (1952); *Kimminau v. Common School District,* 170 Kan. 124, Syl. ¶ 4, 223 P.2d 689 (1950).

We therefore conclude that the trial court correctly held that the statutory terms must be read into Employers' policy so as to provide coverage for the two coaches.

The second issue is whether American Fidelity, as a secondary or excess carrier, has a duty to defend or contribute to the defense of its insureds where the primary carrier is supplying or will supply a defense.

On this issue Employers relies exclusively on *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.,* 212 Kan. 681, 512 P.2d 403 (1973). In that case our Supreme Court adopted the rule that an insurer may not rely on the pleadings alone in determining whether it has a duty to defend a suit against its insured. Instead it must take into account any facts known to it or reasonably discoverable by it, and if there is a possibility that coverage exists there is a duty to defend. The Court there observed that the duty to defend is independent of the duty to indemnify, and may exist even where, in the long run, there proves to be no indemnity coverage.

Employers would apply that rule here by saying that the injured Olson might amend his prayer from the $150,000 now claimed to more than Employers' $300,000 limit, in which case American Fidelity would face potential liability for the excess. We do not think this is the kind of "possibility" of coverage the court was talking about in *Spruill.* There was no primary versus excess carrier question involved in that case. The issue there was whether the "occurrence" giving rise to the insured's potential liability was an insured risk; *i.e.,* whether it was a noncovered

intentional tort or a covered negligent tort. The insurer, the Court said, had a duty to investigate the underlying facts before refusing to defend.

As we read *Spruill,* the possibility of coverage referred to is a possibility that under the facts of the case the insured may be found legally obligated to pay damages because of an occurrence that was an insured risk; that is, a possibility there may be a duty to indemnify arising out of the facts of the case. Here there is no question that Olson's claim arises out of an insured risk under American Fidelity's policy, but so long as Olson's prayer—or statement of the total amount of monetary damages being sought (see Rule No. 118[a], 223 Kan. lx)—does not exceed $300,000, American Fidelity has no exposure. There is no claim made that Olson's injuries are so severe that an amended prayer and a judgment in excess of $300,000 is a reasonable prospect. At this point the likelihood of a duty to indemnify under the American Fidelity policy is pure speculation, with no factual basis whatever. Of course, if the Olson prayer should be amended so as to create an exposure where none now exists, American Fidelity would doubtless need to re-examine its position.

One other facet of the companies' duty to defend needs to be examined. Because, as recognized in *Spruill,* an insurer's contractual obligation to provide a defense is not exactly commensurate with its duty to pay a judgment, an argument may be made that both primary and secondary insurers owe independent duties to defend, so that the excess carrier should share the expense of the defense.

We find only one Kansas case dealing with this subject. *Maryland Cas. Co. v. American Family Insurance Group,* 199 Kan. 373, 429 P.2d 931 (1967). In that case the primary carrier refused to defend. The excess carrier assumed the defense, settled within the limits of the primary carrier, and then brought suit against the primary carrier for the amount of the settlement and the cost of the defense. The opinion of the Court is largely devoted to a determination that there was coverage under the primary policy. Having so determined, the Court held the excess carrier was subrogated to the insured's rights against the primary carrier insofar as the settlement was concerned, and could recover up to the primary carrier's limits. It rejected, however, the excess carrier's claim for attorney fees in making the settlement. Examina-

tion of the briefs reveal that the attorney fee claim was based solely on K.S.A. 40-256. That statute, of course, provides for the allowance of attorney fees to an insured in an action against his own company for breach of the contract of insurance. The fees under the statute are those incurred in that suit, not fees incurred by the insured in a different suit which the insurer was bound to defend.

To the issue here presented, out of fourteen printed pages the Court devoted two sentences:

"In our opinion, plaintiff [excess carrier], under its policy, had a contractual duty with its insured (Willis) to defend the lawsuit instituted by the injured party, and such duty was personal and distinct from indemnification. Accordingly, plaintiff had no right of contribution from the defendant [primary carrier] for attorneys' fees incurred in making such defense, notwithstanding that the defendant may also have a duty to defend Willis as an omnibus insured. (*United States Fidelity & Guar. Co. v. Tri-State Ins. Co.,* [C. A. 10] 285 F.2d 579.)" 199 Kan. at 386.

Three things may be said of this statement: First, the excess carrier relied exclusively on the statute, which had no applicability to the claim. Hence the statement may be regarded as *obiter dictum,* since it went beyond the issues presented by the parties. Second, the Court spoke only of "contribution," a concept applicable only where the duties are coextensive. It does not consider the question of *subrogation,* where a party secondarily liable performs a duty owed by one primarily liable. Third, the principle set out departs from what we consider the better reasoned cases which deal squarely with the issue.

The Tenth Circuit case relied on denied the excess carrier's claim against the primary for contribution to the defense, noting that the excess carrier "does not claim by subrogation." Why it did not claim by subrogation does not appear—the facts appear to make out a classic case. Be that as it may, in the absence of a subrogation claim the Tenth Circuit held that "[t]he obligation is several and the carrier is not entitled to divide the duty nor require contribution from another absent a specific contractual right." *United States Fidelity & Guar. Co. v. Tri-State Ins. Co.,* 285 F.2d 579, 582 (10th Cir. 1960). The Tenth Circuit relied in turn on four federal cases, noting one contra.

The premier federal case, cited by each of the others, appears to be *Continental Casualty Co. v. Curtis Pub. Co.,* 94 F.2d 710 (3d Cir. 1938). There Continental, the primary carrier, refused to defend. Curtis' excess carrier assumed the defense and judgments

against Curtis were settled within Continental's limits. Curtis, not the insurer, paid the settlement amount and then sued Continental for the amount paid plus the cost of defense. The Court held Continental liable to Curtis for the settlement, but disallowed the cost of defense because that had in fact been paid by the excess carrier and not by Curtis. The right of the excess carrier to recover against the primary by way of subrogation was not considered, since the excess carrier was not a party to the action. Courts relying on this case in holding there is no right of subrogation read too much into it.

The Tenth Circuit also relied on *Financial Indem. Co. v. Colonial Ins. Co.,* 132 Cal. App. 2d 207, 281 P.2d 883 (1955). That case has since been expressly overruled, in *Continental Cas. Co. v. Zurich Ins. Co.,* 57 Cal.2d 27, 17 Cal. Rptr. 12, 366 P.2d 455 (1961). In *Continental* three insurers covered the use of a logging truck involved in a loading accident which caused injury to the driver, who sued the operator. Zurich, later determined to be the primary carrier, refused to defend. Continental, one of the two excess carriers, defended the suit, which resulted in a $20,000 judgment. In the later declaratory judgment action it was held that the primary carrier was liable for the judgment up to its policy limit of $15,000 and the excess carriers were liable for the balance pro rata. Further, the costs of the defense should be shared by all three insurers in the same proportion that they were liable for the loss.

The Court there rejected a contention that the primary carrier should bear the entire cost of the defense, noting that in none of the cases where that had been the result had it been shown "that the primary coverage was inadequate to indemnify the loss or that the excess policies would at all be reached." (57 Cal.2d at 38.) In the case at bar there is likewise no showing that the primary insurance is inadequate or that the excess policy will be reached.

In reaching its result on the duty to defend the California Court first noted:

"Two opposing views appear in the cases where the insured, or an insurer who has faithfully performed, has sought contribution from an insurer who refused to provide a defense. On the one hand it has been held that 'where two companies insure the same risk and the policies provide for furnishing the insured with a defense, neither company can require contribution from the other for the expenses of the defense where one denies liability and refused to defend. [Citation.] It has been stated that the duty to defend is personal to both insurers; thus neither is entitled to divide that duty with the other.' [Citations omitted.]  . . . .

"On the other hand there are courts which, with little if any discussion of the point, appear to have found no difficulty in ordering pro rata sharing of defense expenses where coverage is provided by more than one insurer. [Citations omitted.] We find no roadblocks to such a result and we think that the considerations which lead to it are more persuasive than any reasons suggested to the contrary. In this connection we note that any services contemplated by the agreement to defend are not personal in the sense that the services of any specifically named individual would be personal. Rather, such services necessarily contemplate the employment by the company of competent licensed attorneys and other personnel who, from a practical standpoint, must be viewed as rendering services to the company and for its benefit and the benefit of other obligated insurers, as well as for the benefit of the insured.

"Under general principles of equitable subrogation, as well as pursuant to the rule of prime importance—that the policy is to be liberally construed to provide coverage to the insured—it is our view that all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers. A contrary result would simply provide a premium or offer a possible windfall for the insurer who refuses to defend, and thus, by leaving the insured to his own resources, enjoys a chance that the costs of defense will be provided by some other insurer at no expense to the company which declines to carry out its contractual commitments." *Continental Cas. Co. v. Zurich Ins. Co.,* 57 Cal.2d at 36-7.

After observing that the agreement to defend is as important as the agreement to indemnify, the Court went on:

" 'Having defaulted such agreement the company is manifestly bound to reimburse its insured for the full amount of any obligation reasonably incurred by him. It will not be allowed to defeat or whittle down its obligation on the theory that plaintiff himself was of such limited financial ability that he could not afford to employ able counsel, or to present every reasonable defense, or to carry his cause to the highest court having jurisdiction, and that therefore he should not have had, and will not be allowed compensation for, an attorney who filled the breach. Sustaining such a theory would not only tend to discourage busy attorneys from rendering adequate services for needy clients but would tend also to encourage insurance companies to similar disavowals of responsibility with everything to gain and nothing to lose.' In our view, it is but corollary to the above quoted proposition to hold, as we do, that no insurer which deliberately breaches its obligation to the insured should be permitted thereby to profit, whether at the expense of the insured, or of an insurer which faithfully discharges its obligation." 57 Cal.2d at 38.

The principles set out in that case were purportedly applied in *Government Employees Ins. Co. v. St. Paul Fire Etc. Ins. Co.,* 243 Cal. App. 2d 186, 52 Cal. Rptr. 317 (1966). There the primary carrier which refused to defend had a policy limit of $20,000, the excess carrier which defended had a limit of $100,000. Judgment

was for $104,000, exhausting the primary and reaching $84,000 into the excess limit. The Court prorated the cost of defense according to the policy limits, rather than the actual liability. Since the primary insurer had a limit of $20,000 of the $120,000 total coverage, it was liable for one-sixth. This appears to be a misapplication of the rule. In *Hartford Accident & Indem. Co. v. Civil Service Employees Ins. Co.*, 33 Cal. App. 3d 26, 108 Cal. Rptr. 737 (1973), liability for damages was the measure of proration as the *Continental* case would suggest. Applying the liability yardstick, the primary carrier with a $10,000 limit was required to pay two-thirds of the cost of defense incurred by the excess carrier in reaching a $15,000 settlement, although the excess carrier's limit was $25,000.

The same rule was applied to a case much like the one at bar in *Travelers Ins. Co. v. Norwich Union Fire Ins. Soc.*, 221 Cal. App. 2d 150, 34 Cal. Rptr. 406 (1963). It there appeared that the pending claim of one Chlemens would be within the limits of the primary carrier. The Court concluded:

"The Travelers policy provides that its coverage shall be excess with respect to a nonowned car. Thus the primary liability to indemnify is that of Norwich (*American Automobile Ins. Co. v. Republic Indem. Co.*, 52 Cal.2d 507, 512 [341 P.2d 675]). If judgment in fact exceeds the Norwich limits, that company would be entitled to contribution from Travelers of defense costs in the same ratio that the two share in paying such judgment (*Continental Cas. Co. v. Zurich Ins. Co.*, 57 Cal.2d 27, 36 [17 Cal. Rptr. 12, 366 P.2d 455]). We could not determine, in this litigation, that the primary coverage will be inadequate. In view of the likelihood that no judgment will ensue in the Chlemens action, practical considerations suggest that this hypothetical right of Norwich to contribution be reserved. *If, however, the only loss is to be the cost of defense, we are satisfied that it should fall upon the primary coverage.*" 221 Cal. App. 2d at 153-4. (Emphasis added.)

From the foregoing the following principles may be derived:

1. Where the same risk is covered by both primary and secondary insurance, the primary insurer has the primary duty to defend.

2. Where the claim made is within the limits of the primary policy, and the primary insurer undertakes the defense, the secondary insurer is not required to defend.

3. Where the claim is over the limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay.

This result does not absolve any carrier from a duty to defend, but places the primary burden on the carrier which has issued primary insurance. It also recognizes the equitable subrogation rights of an insurer which has, by fulfilling its own duty to defend, also fulfilled an obligation owed by another.

In the present case we have not reached the stage where one insurer has defended, so the question of subrogation is not involved. The trial court declared that Employers, as the primary insurer, has the primary duty to defend. Whether American Fidelity, the excess insurer, will have an obligation to share the cost of the defense will depend on whether and to what extent it may become obligated to pay any judgment or settlement.

Affirmed.